Decided 18 June, 1900.

## MCBEAN v. MCBEAN.

[61 Pac. 418.]

EVIDENCE OF MARRIAGE.

1. Upon a consideration of the testimony herein, *held*, that it is not sufficient to establish a marriage of plaintiff's ancestor.

MARRIAGE ACCORDING TO INDIAN CUSTOM.

2. Where a marriage has taken place between two members of an Indian tribe, or between a white person and a member of the tribe, according to tribal customs, the union is binding everywhere in the United States.

| 37 | 195 |
|----|-----|
| f39 | 142 |
| 37 | 195 |
| e45 | 123 |

PRESUMPTIONS AS TO THE EXISTENCE OF A MARRIAGE.

3. The presumption of a lawful marriage from the fact that the parties have lived together and cohabited as husband and wife does not arise where the proof indicates that the relations were entirely meretricious from their inception.

DESCENT OF INDIAN LANDS—REPEAL OF STATUTE.

4. Supp. Rev. St. U. S. p. 898, ᶾ 5, providing that, for the purpose of determining the descent of land to the heirs of Indians, the offspring of Indians who have cohabited together as man and wife shall be deemed to be legitimate, is general in its purpose, and does not repeal or in any way affect the special act of 1885, relating to the allotment of lands to the Umatilla Indians, and enacting that the law of alienation and descent in force in the State of Oregon shall apply thereto.

From Umatilla : STEPHEN A. LOWELL, Judge.

Suit by Cora McBean against Jane McBean and others to determine who are the heirs of John McBean, deceased. From a decree in favor of defendants, plaintiff appeals.

AFFIRMED.

For appellant there was a brief and an oral argument by *Messrs. Henry J. Bean* and *J. H. Lawrey*.

For respondents there was a brief over the names of *Oscar Cain* and *Thos. G. Hailey*, with an oral argument by *Mr. Hailey*.

MR. CHIEF JUSTICE WOLVERTON delivered the opinion.

1.    John McBean, an allottee of one hundred and sixty acres of the Umatilla Reservation, in Umatilla County, Oregon, designated in the allotment as "Cayuse Mixed Blood No. 388," died intestate, leaving surviving him his mother, brothers and sisters, and nieces and nephews, who are the defendants herein.   The plaintiff claims to be his granddaughter, and the only living descendant of heritable blood, and the purpose of this suit is to determine her right to the title and to the rents and profits of the land so allotted to him.    Plaintiff is the daughter of William McBean, the son of John and an Indian woman, whose maiden name was Jane Timoochin, the daughter

of the Nez Perce chief.  The question upon which the
case hinges is whether William was born in lawful wed-
lock, as to which there is much conflict in the testimony.
John McBean was of mixed blood, but had no tribal rela-
tions with the Indians until 1887, when he was adopted
by the Umatillas, chiefly for the purpose of sharing in
the allotment.  When about fourteen years old he was
employed by the general government as interpreter be-
tween the Indians and the agents and representatives of
the government.   John W. Gay, a witness of much intel-
ligence, testifies that he met John in 1854 at Governor
Stevens' council with the Indians, when he was twelve
or thirteen years of age, and again at The Dalles in 1856 ;
that he first saw Timoochin's daughter during the win-
ter of 1857 and 1858, who at that time was living with
John McBean in a tent back of the garrison at Fort
Walla Walla ; that he was not married to the woman,
but was simply living and cohabiting with her as some
of the unmarried officers and private soldiers did with
other Indian women who stayed about the garrison, and
that these relations continued for a year or a year and a
half.    Joseph McEvoy relates that he became acquainted
with John McBean in 1856 ; that witness was then a
soldier, and that McBean was an interpreter for the gov-
ernment, and served in the same company with him ;
that witness was afterwards connected with the quarter-
master's service, and that they continued under military
discipline until 1861, and that McBean could not leave
during the time without a pass or furlough from the
proper officer ; that he began living with this woman in
a tent on Garrison Creek in the fall of 1857, possibly not
until 1858, and that they lived together about a year and
a half in a tent procured from the quartermaster.

John Silcott testifies that he first knew John McBean in
Walla Walla in 1858 ;  that he and Timoochin's daughter

were living together as man and wife, and that a boy was
born as the issue of such relations, who was named Wil-
liam McBean ; that as near as he could tell the parties
lived together about a year ; that the woman afterwards
lived with several different men as their wife ; and that
she was not reputed to be a lewd or immoral woman.
Thomas B. Beall testifies that he became acquainted with
John McBean in the fall of 1857 ; that he was then acting
as Indian interpreter in the service of the United States
government, and was married, but his wife was living at
Alpowai with her father, the Indian chief Timoochin, and
her mother, Tema ; that in the spring of 1858, having ob-
tained a leave of absence from Colonel Steptoe, he went
after her, and brought her home ; that they lived in a
house back of the commanding officer's quarters, and con-
tinued so to live until some time in July ; that he saw
them and their child, William McBean, frequently, and
that the child was born some time in the fall of 1857 ;
that the parties lived together something over a year, and
were generally reputed to be husband and wife ; that the
woman subsequently lived with several other men as their
wife ; that she lived with John Silcott in 1866, and was
not considered an immoral woman.   Catherine Jordal
testifies that John McBean was married to Jane Timoo-
chin four or five years after the Cayuse War, by Father
Mesplie, a Catholic Priest, at the house of John's father
and mother ; that she was present at the wedding, and
witnessed the ceremony ; that John's mother and two of
his sisters were also present ; and that she was seventeen
years of age at the time.   She relates that Father Mesplie
remonstrated with John at the time for living with the
woman without being married as required by the rites of
the Catholic Church.   Joe La Rocque testifies that John
went down to The Dalles ; that Timoochin's crowd went
down there also, and that he and Timoochin's daughter

were married at the church while there by Father Mes-
plie; that he was not present at the church, but he saw
the old folks when they went down to see him married;
and that they were not married at Walla Walla. This
was before the end of the Cayuse War, which occurred in
the years 1855 and 1856. Jane McBean, John's mother,
testifies that John was never married to the Timoochin
woman, but that some time subsequent to the Cayuse
War he was married to Tintinnitz's daughter (about this
there is some confusion whether the marriage was to her
or to Lalouskin's sister) at her home, and by the Catholic
Priest, Father Mesplie; that Jane Timoochin and her
mother brought the child Willie McBean to their place
shortly after the war, when he was just learning to walk,
and left him there; and that he remained with them and
was supported by them until he became big enough to
travel, when he went away.

Mrs. Mary La Favre testifies that she is a sister of John
McBean; that she was at home when John and Father
Mesplie were there; that Father Mesplie remonstrated
with John for living with Jane Timoochin without being
married to her by a priest, and that John said he did not
want to marry her, because she would not stay with him,
and finally told the priest that he would not marry her;
that Father Mesplie never at any time, to her knowl-
edge, performed the ceremony for the marriage of John
McBean, her brother, and Timoochin's daughter. She
further testifies that John was married to Tintinnitz's
daughter about two years after the war, at the house of
her father and mother, and that Father Mesplie officiated
in the ceremony; that the first woman he took was
Timoochin's daughter; that he stayed with her a little
over a year; that she was called John's wife, but he was
never married to her, so far as she knew. Susan Gagon
testifies that John got a woman at The Dalles named

Jane Timoochin, and brought her to Walla Walla; that he was not married to her,—just lived with her; that John was later married to Tintinnitz's daughter at Mrs. McBean's house, and that Father Mesplie came from The Dalles to marry them; that John and Timoochin's daughter were married Indian fashion; that they separated, and she went back to her folks at Lapwai or Alpowai.

Without particularizing further, it is sufficient to state that John was subsequently married to Lalouskin's sister, and then to Spelilla's sister, in each instance by a Catholic Priest, and subsequent to the decease of his former wife; that it was a tenet of the Catholic Church, of which John was a member, that the priest should not officiate when one of the contracting parties had a spouse living, whether divorced or not. There is much conflict in the testimony touching the Indian custom of marriage and divorce, one notion or idea being that the Indians purchased their wives; that is to say, that the parents of the young people who were desirous of entering into the marital union would agree among themselves upon the amount of the stipend to be paid to the girl's parents by those of the young man, and when this was arranged, and the stipend paid, the contracting parties assumed the marital relation. Either party was at liberty to abandon the other, and such was the manner of their divorcement. The other is that they simply assumed the marital relation and cohabited as man and wife without previous contract or ceremony; that such relations continued at the pleasure of either party to the union; and that a voluntary separation constituted a divorcement entitling either to enter into new relations with another. Aside from this, there is much loose testimony to the effect that these parties lived together as man and wife for a space of time ranging from one to six or seven years; that

Jane Timoochin was reputed to be and generally known as John's wife; that he recognized and treated her as such, and admitted to sundry persons that she was his wife.

Because of the great divergency in the testimony, it is utterly impossible to determine the exact history of the affair which forms the basis of this controversy. It is probable, and more so than any other theory that we are able to adopt, that John McBean, while in the employ of the government as interpreter, met Timoochin's daughter at The Dalles, and there began living with her, and continued the relation at Fort Walla Walla for a year or two. That he was never regularly married to the woman according to the rites of the Catholic Church is quite well established. It is related by one of the witnesses, Mrs. Jordal, that he was married at the house of his parents to this woman by Father Mesplie, a Catholic Priest who was then located at The Dalles, while another witness testifies that he was married at The Dalles, the same party officiating. The mother and sister of John both testify that no marriage ceremony ever took place at the house of John's parents between these people, but that Father Mesplie did officiate in a ceremony at their house uniting John and Tintinnitz's daughter in the bonds of matrimony. These witnesses fix the date of the event at about the same time that Mrs. Jordal swears that he was married to Timoochin's daughter. Mrs. Jordal was then seventeen years of age, and is more likely to be mistaken than John's mother and sister. Another circumstance which goes to bear out this idea is that by the rites of the Catholic Church it was not permissible for a Catholic to remarry while he had a wife living, and, as Father Mesplie performed the ceremony of marriage between John and Tintinnitz's daughter, he would most assuredly have had in mind the fact of any prior mar-

riage at which he officiated between John and another woman then living. The testimony touching the alleged marriage at The Dalles is so indefinite that no reliance can be placed upon it. The party so testifying says that he was not at the church in which they were married, but that he saw the old people going there, and the rumor was that John was to be married to this girl. So that, upon the whole, we have concluded that John was never married to Timoochin's daughter according to the rites of the Catholic Church.

2. Such being the case, the next inquiry is whether these parties were married according to the recognized and established Indian custom then in vogue with the tribe to which the parties, or one of them, belonged. As a general proposition, it is well settled that a marriage valid according to the law or custom of the place where it is contracted is valid everywhere : Story, Confl. Laws, § 113. And it is the adjudged policy of the law to treat the Indian tribes who adhere to their peculiar customs, as separate communities or distinct nationalities, with full and free authority to manage their own domestic affairs, and to pursue their own peculiar habits and customs, especially as it concerns the marriage relation. And this is so although their territory is located within the state lines, and the federal government manages their affairs through agencies designated for the purpose. Nor are they regarded as subject to the state laws : *Boyer v. Dively*, 58 Mo. 510, 529, citing *Morgan v. McGhee*, 5 Humph. 13, and *Wall v. Williams*, 11 Ala. 826. As broadly stated in *Kobogum v. Jackson Iron Co.* 76 Mich. 498 (43 N. W. 602): " The United States Supreme Court and the state courts have recognized as law that no state laws have any force over Indians in their tribal relations ;" citing many authorities. So, it is said in *Earl v. Godley*, 42 Minn. 361, 362 (18 Am. St. Rep. 517, 44 N. W. 255):

" The general rule is that marriages valid by the laws of the country where they are entered into are binding here, though not solemnized in accordance with the provisions of our laws ; and the same rule must be adopted in relation to these Indian marriages, where the tribal relations still exist." The rule was applied in *Johnson* v. *Johnson*, 30 Mo. 72 (77 Am. Dec. 598), where the marriage relation was assumed in Indian territory, outside of the limits of a state, by a white man and an Indian woman according to the tribal customs of the tribe to which she belonged ; and again in *Morgan* v. *McGhee*, 5 Humph. 13, where the marriage was between a white man and a half-blood Cherokee upon Indian territory situate within the limits of a state. From these authorities it would seem that where the marriage is between members of the tribe wholly, or between white persons and members of the tribe, conforming to tribal customs, the union will be recognized as constituting a valid marriage in the state and federal courts. If valid everywhere, it follows as a logical sequence that the offspring of the contracting parties will take from them by the rules of inheritance in vogue in the state or country of their adoption.

At the time of the alleged marriage the Territory of Washington had been set apart by congress and provided with a form of government, but some of the Indian tribes, yet maintaining their distinct tribal customs, among whom may be designated the Cayuses, Walla Wallas, Umatillas, and Nez Perces, still occupied, without relinquishment of the Indian title, a large portion of the territory, which included Fort Walla Walla within its boundaries. Whatever testimony has been introduced touching the marriage custom then prevailing is not confined to any one of the tribes named, and we assume that whatever the custom was it prevailed alike among

all these tribes. Timoochin's daughter was a Nez Perce, but John McBean; although having Indian blood, had no tribal affiliations until he was adopted by the Umatillas, as above stated.

The evidence has impressed us that the prevalent marriage custom was the one which has for its basis the purchase of the wife by the relatives of the intended husband, especially where it concerns the marriage of young persons. We will briefly state our reasons for this conclusion, without attempting to dilate largely upon the evidence. Mrs. Woodard testifies, when asked touching her knowledge of the custom, that the Indians who were under the influence of the priest generally married according to the rites of the Catholic Church, and the "others bought their women;" and J. W. Gay, who was conversant with the Indian habits and customs, says : "My understanding of the Indian rules of marriage is this : If I had a son, and another Indian had a daughter, and my son wanted that daughter, the fathers of the two parties would meet and set a price on her, and if I could raise the means to buy that daughter from the other Indian my son would get her, and if not he could not get her. If he stole her, she would be taken back." This is a crude, but it is the most intelligent, explanation made in the record of the custom, and it is otherwise distinctly corroborated. Other witnesses, however, testify in a general way that the marital relations were consummated by the mere cohabitation of the sexes, which continued at the pleasure of either spouse ; but it cannot be said that this latter alleged custom has been substantiated by the evidence.

3. There is no direct proof that John McBean and Timoochin's daughter were ever married in accordance with the custom prevailing ; but it is contended that the fact, which was undoubtedly proven, that these parties lived

together and cohabited as man and wife is presumptive evidence of a lawful marriage. This would be true if not for the further fact that the proofs indicate that the relations between these people were meretricious from their inception. Several witnesses testify that a number of Indian women stayed about the garrison, and that white men in the employ of the government lived with them temporarily, but with no intention of marrying them. The testimony shows no more than this touching the relations that existed between John McBean and this Indian woman. Where parties have been living together and cohabiting as man and wife, and were reputed to be such in the community where they lived, and the husband has represented the woman to be his wife, there is a presumption that they were in fact lawfully married; but this presumption does not obtain where there is casual commerce between the sexes without intent upon the part of either to consummate a marital union. Promiscuous temporary intercourse has never been recognized as constituting marriage. It is said in Lawson's Rights and Remedies (vol. 2, § 711) that a marriage "will not be presumed even where, for convenience, the parties hold themselves out as man and wife before third persons, provided their cohabitation has the elements of a purely meretricious relation."

As we have seen, John McBean fell in company with Jane Timoochin at The Dalles while he was interpreter for the government. He was very young at the time, and the girl was not older than he. They were next heard of at Fort Walla Walla, when they are found to be living together in a tent which he had procured from the quartermaster for temporary use. This relation did not continue for more than a year or two, at most, and while the parties may have been reputed to be man and wife, and John McBean may have made admissions to the effect that this

woman was his wife, yet we cannot find from the testimony that he intended to form any such relations with her. Whatever relations he had with her were temporary, and it is very probable were not intended by either as the consummation of a marriage between them in any form, either in pursuance of the Indian custom or of the rites of a more modern civilization. The child was not born at the place of their residence, but at Alpowai. There is some testimony that McBean went to Alpowai to bring the mother and child home to his habitation, but the better view is that Timoochin's daughter and her mother brought the child to the home of John McBean's father and mother without his concurrence, and left it there to be reared by them. It is not seriously denied that the child is the offspring of the temporary intercourse between these parties, but it is very apparent that such relations do not constitute a marital union, even according to the custom of the Indians shown to be then prevailing, and therefore the child has no inheritable blood by which he would be entitled to the real estate of the father.

4. It is contended that, it having been shown that William McBean is the child of John McBean, the plaintiff would inherit from the grandfather by virtue of the act of congress of February 28, 1891 (Supp. Rev. St. U. S. p. 898, § 5), which provides as follows: ''That for the purpose of determining the descent of land to the heirs of any deceased Indian under the provisions of the fifth section of said act, whenever any male and female Indian shall have cohabited together as husband and wife according to the custom and manner of Indian life, the issue of such cohabitation shall be, for the purpose aforesaid, taken and deemed to be the legitimate issue of the Indians so living together, and every Indian child, otherwise illegitimate, shall for such purpose be taken and deemed to be the legitimate issue of the father of

such child.'' Section 5 of the original act, which was
"An act to provide for the allotment of lands in severalty
to Indians on the various reservations, and to extend the
protection of the laws of the United States and the terri-
tories over the Indians, and for other purposes,'' adopted
February 8, 1887 (24 Stat. 388), provided as follows:
''That the law of descent and partition in force in the
state or territory where such lands are situate shall apply
thereto after patents therefor have been executed and de-
livered, except as herein otherwise provided; and the laws
of the State of Kansas regulating the descent and partition
of real estate shall, so far as practicable, apply to all lands
in the Indian Territory which may be alloted in severalty
under the provisions of this act.'' The act of 1891 is
an amendment of this original act. As will be seen by
the title, the original act is a general one applying to the
Indians upon the various reservations. It was enacted
and became a law subsequent to the act providing for
the allotment of lands upon the Umatilla Indian Reser-
vation. That act was adopted March 3, 1885, and it
was enacted thereby, among other things, ''that the law
of alienation and descent in force in the State of Oregon
shall apply thereto after patents have been executed, ex-
cept as herein otherwise provided.'' The act of 1885
was special in its nature, affecting none but the Umatilla
Reservation and the confederated tribes inhabiting the
same. While the act of 1887 was general in its purpose,
it seems there was no intention of extending its pro-
visions to the Umatilla Reservation and the Indians con-
cerned. The allotments are made upon an entirely dif-
ferent basis, and the acts are otherwise incongruous, so
that the general act could not well supersede the special
without repealing it, and no such intention is made ap-
parent from the terms of the general act. The clause in
the latter act touching inheritance and partition, there-

fore, did not supersede the provisions touching the same subject in the special act, and it logically follows that the amendment of 1891 to the general act did not affect the special act. The laws of descent within this state are therefore applicable to the present controversy, and not those denoted by the acts of congress of 1887 and 1891. The plaintiff cannot, therefore, inherit through her father the property of her grandfather John McBean. These considerations affirm the decree of the court below, and it is so ordered.                          Affirmed.

Decided 11 June, 1900.