Argued March 25; affirmed May 25, 1937

# FRENCH *v.* STATE INDUSTRIAL ACCIDENT COMMISSION

(68 P. (2d) 466)

*William P. Lord,* of Portland (T. Walter Gillard, of Portland, on the brief), for appellant.

*Victor R. Griggs,* Assistant Attorney General (I. H. Van Winkle, Attorney General, on the brief), for respondent.

ROSSMAN, J. Two issues only are argued in the plaintiff's (appellant's) brief: (a) The trial judge erred in failing to instruct the jury that a man and a woman deporting themselves as husband and wife are presumed to have been legally married; and (b) the plaintiff's motion for judgment *non obstante veredicto* should have been sustained. The plaintiff claims that she and one George French contracted a common-law marriage in Idaho. The defendants do not deny that common-law marriages may be lawfully contracted in that state, but both parties agree that such marriages cannot be legally contracted in either California or Oregon, the other two states in which the plaintiff and French resided at the times material to this controversy.

December 17, 1935, the plaintiff filed with the defendant commission a claim for compensation in which, besides averring the death of French on November 6, 1935, under circumstances for which compensation was payable, stated that he and she were married in San Francisco, California, April 12, 1925. Compensation was denied. January 25, 1936, through an attorney, she filed with the commission a petition for a rehearing in which she stated:

"Claimant in the year 1925 was an unmarried woman and in all respects competent to marry, and one George French was likewise an unmarried man and

competent to marry; thereupon the said parties entered into a marriage and ever since that time lived together until the death of said George French    *    *    *.''

This petition was accompanied with a letter from the attorney in which he stated: ''This claim rests upon a common-law marriage contracted in the state of California in the year 1925.''

Upon the rehearing the plaintiff swore that she first met French in San Francisco in 1921, that later the two began living together, and that still later they moved to the state of Idaho. Her attorney then asked her: ''You say it was in 1929 that you and Mr. French got into this marriage in Idaho?'' She answered, ''Yes, sir.'' The attorney then asked permission to amend the petition for a rehearing by substituting 1929 for 1925 as the date of the alleged marriage. The plaintiff swore that French was a Canadian citizen who had served with the Canadian forces for four years during the course of the World war. She produced a letter dated February 14, 1930, addressed to him from the Department of Pensions and National Health of Canada, from which we quote: ''It is noted from Life Certificate completed by you on December 14th, 1929, that you were married on July 8th, 1926.'' No reply was made to this letter and the plaintiff, as a witness, offered no explanation of this date.

Concerning her conception of the relationship between herself and French as they proceeded to Idaho, she testified:

''Yes, sir, we often talked it over. He said there wasn't any use getting married as we were already married. We stayed there for three months and then we went with the intention of going back; he was going to work in the smelter in Kellogg.''

The following is the explanation she gave before the commission for their omission to have a ceremonial marriage:

"Well, we talked it over and just another of those puddles, that was all. Intended to right along, getting married, until we went to Idaho; then after we went up there he was kind of proud and he just hated to have people know he was not married."

Although she testified that she and French lived together, that he treated her as his wife, and that all of their acquaintances deemed the two husband and wife, she did not mention any agreement that contemplated they should assume that relationship. The commission held that the plaintiff was not a dependent of the deceased, and awarded no compensation.

Next, the plaintiff filed the complaint which brought this matter before the circuit court. In it, after averring that French died November 6, 1935, she alleged:

"For many years past plaintiff was a single woman over the age of 18 years and in all respects competent to marry, and said George French was likewise a single man, over the age of 21 years and in all respects competent to marry, and thereafter the said parties, in the State of Idaho, did enter into an agreement by the terms whereof plaintiff and said George French did agree to become husband and wife, and did become husband and wife, and entered upon the marriage relation, and ever since said time, which was more than ten years prior to the death of said George French, plaintiff and said George French lived and cohabited together as husband and wife."

The defendants filed an answer in which they averred that the plaintiff's application to the commission alleged that her marriage to French occurred April 12, 1925, in San Francisco, California. The reply denied this averment.

In the circuit court the plaintiff, as a witness, produced two applications for pensions which French had filed with the Canadian Pension Commission. Both bore the signature not only of French but also of the plaintiff. From the one dated December 15, 1929, we quote: "I was married on July 8, 1926." At that time the two were living in Oregon. The other is dated November 14, 1930, and from it we quote: "I was married on —— yes." It gives no date.

As a witness in the circuit court, the plaintiff swore that she first met French in 1921 in San Francisco when he became a boarder in a place she was operating. Both were then 47 or 49 years of age. She testified that three months after they met "we got an apartment and went to live as man and wife." In 1925 they went to Idaho to visit the plaintiff's brother, and there took place the incidents which effected the common-law marriage—if such a marriage ever occurred. Her brother's wife, so the plaintiff declared, told her that in Idaho common-law marriages could be lawfully contracted.

If vows to become husband and wife were ever exchanged between the two the evidence concerning them must be found in the following, quoted from the plaintiff's testimony. It is not all of her testimony concerning what occurred in Idaho, but is, we believe, the principal parts:

"Well, we thought we lived together as long as we had, we wasn't going to take any more chances among us and live together as husband and wife and thought it was legal in Idaho, we would make our home there and Mr. French got sick and we had to go back. * * *

"Q. When you got there did you have any understanding with Mr. French about your affairs? A. No, sir.

"Q. What was that? A. Well, we talked it over and talked it over with my sister-in-law and thought we would reside there because it was a common-law marriage where it wasn't in Oregon, in Idaho.

"Q. You understood what a common-law marriage was did you? A. Yes.

"Q. Understood it was legal in Idaho, did you? A. Yes, sir.

"Q. How long did you live in Idaho, after that? A. We were there six months, as I remember.  *  *  *

"Q. How did it happen that you entered into any discussion as to whether or not you were married when you got into Idaho? A. Well, I don't know exactly to explain it because I myself didn't believe in anything like that.

"Q. You didn't believe in anything like that? A. No, sir.

"Q. Then why in the world didn't you get married then? A. That is what I would like to know.

"Q. Nothing to prevent you, was there? A. No, sir, not a thing.

"Q. Now, you say you got into Idaho and the question arose whether or not you were married? A. Well, we were ashamed of ourselves, that is just the reason.

"Q. Anyway you learned when you got into Idaho that you were not married, that is correct, isn't it? A. Yes.  *  *  *

"Q. What did you and your husband say when you went into this relationship in Idaho? A. Well, we just talked it over that if we went back to Idaho to live, if we lived in Idaho, we didn't have to get married and didn't have to let people know it.

"Q. You say you endeavored to get married? A. We didn't have to.

"Q. Is that why you went into Idaho. A. Yes.

"Q. Because you could live there and not have to get married? A. They call it legal.

"Q. You mean you and your husband went into Idaho so that your marriage would be considered legal over there? A. Why, I guess so.

"Q. That was your idea in going into Idaho, was it? A. Yes.

"Q. So that your relationship would be legal? A. Yes, sir.

"Q. You didn't do anything there to make it legal, did you? A. No, we lived there.

"Q. What is that? A. Nothing, only lived there.

"Q. You didn't enter into any further agreement, did you? A. I don't know. * * *

"Q. What is the fact, Mrs. French, is it true, as you have just told me, that you considered if you went into Idaho that would make your former relations legal? A. Yes.

"Q. That is what you considered? A. Yes.

"Q. So that when you got into Idaho you didn't have to do anything else to make your present relationship a legal marriage, is that the way you considered it? A. I guess so.

"Q. And you didn't do anything further when you got into Idaho except to continue your relationship as you lived before, is that true? A. Yes, sir. * * *"

It will be recalled that upon the rehearing before the defendant commission the plaintiff claimed that she and French were in Idaho in 1929 and that a common-law marriage took place at that time. Towards the close of the trial it developed that the second Idaho visit was in 1935 and not in 1929. Concerning this second visit and what then occurred concerning her relationship with French, she testified, in part:

"Q. You went there a second time? A. We went over there a second time.

"Q. Did you have a second common-law marriage in Idaho? A. Well, I don't know what you call a marriage; I am stumped.

"Q. I am trying to find out as to when, where and how you married Mr. French, if you can tell; did you have a second marriage in 1929? A. If you call that marriage we must have because we were over there a second time.

"Q. Didn't you marry him the second time and not the first time? A. I don't know.

"Q. Is that correct? A. I guess so.

"Q. Why did you consider it was necessary to have another marriage in Idaho in 1929; will you tell us—will you tell us that Mrs. French? A. Well, I don't know how to explain it only that I was over there the second time in 1929. * * *

"Q. Well, now, I don't believe you answered my further question; did you contract a common-law marriage in Idaho twice, or didn't you? A. Well, I would say yes. * * *

"Q. Then you were not over in Idaho between 1925 and 1935, is that correct, Mrs. French? A. I believe it is.

"Q. You went in 1925, stayed in Oregon until 1935, and then went to Idaho? A. Yes.

"Q. That is when you contracted your marriage the second time? A. I don't think it is any contract about it.

"Q. That is when you felt you were married the second time? A. No, sir, when we went the first time.

"Q. What was that? A. When we went the first time I said.

"Q. Did you do anything to have a common-law marriage the second time you went over there? A. No, sir."

Mrs. Theodore Strope, plaintiff's sister-in-law, and who is mentioned by her in the above-quoted testimony, is the only other witness who testified. The following is the material part of her testimony:

"Q. Was there anything said about what they had been doing; about their affairs? A. Yes, a little bit between her and I; of course, we talked it between ourselves; didn't want it to get out. We didn't know whether she was legally his wife.

"Q. Did she tell you about the circumstances in San Francisco? A. Yes, sir, she did.

"Q. Told about them coming into Oregon? A. Yes.

"Q. What did she—what did you tell her about, about conditions in Idaho? A. I told her I didn't want no scandal or anything; I didn't see no reason why they should have to go really be married again. I know it was positive common-law marriages were legal in Idaho.

"Q. You told her about it? A. Yes, I did."

The plaintiff testified, as she had before the commission, that she and French were regarded by their friends as husband and wife, that he registered the two at hotels as Mr. and Mrs. George French, and that she, with his knowledge, assumed the name of Mrs. George French. We know of no other items material to this controversy except the fact that no children were born of this alleged union.

Although no request was made, the plaintiff contends that the trial judge erred when he did not base an instruction upon subdivision 30 of § 9-807, Oregon Code 1930, and thereby inform the jury that a man and a woman, deporting themselves as husband and wife, are presumed to have entered into a lawful contract of marriage.

It will be observed that the testimony concerning the alleged marriage agreement was given by one who claimed to have been a participant in it. This, therefore, is not a case where both of the participants have passed to the beyond taking with them all available information concerning the arrangement. Likewise, this is not a case where a nonparticipant, as, for instance, a child born of the alleged union, is attempting to prove that a marriage had occurred. Nor is there any contention that any witnesses were present when French and the plaintiff agreed to become husband and wife, if they ever so agreed. Hence, the only person, with

the exception of the deceased, who knew anything about this alleged marriage testified. Since the deceased could have known no more upon the subject than the plaintiff, his testimony would have been cumulative if not contradictory. Thus, the plaintiff does not contend that there is something missing concerning which she could not be expected to have knowledge; as, for instance, the issuance of a marriage license, the entry of a divorce needed to qualify one or the other of the parties for the new marriage, the grant of authority to perform marriages to the individual who performed it, etc. In all of the cases cited by the plaintiff where a presumption of marriage was employed, the party favored by it was excused from producing a document or proving a fact of which he had no knowledge. For instance, in *Ollschlager's Estate v. Widmer,* 55 Or. 145 (105 P. 717), the presumption excused the woman who claimed to be the decedent's wife from producing the marriage license. In *Doertch v. Folwell Engineering Co.,* 252 Mich. 76 (233 N. W. 211), in *Huff v. Huff,* 20 Idaho 450 (118 P. 1080), and in *Alto v. State Industrial Accident Commission,* 118 Or. 231 (246 P. 359), wherein one of the parties to the alleged marriage had been previously married, the presumption excused him from proving the divorce or death of his earlier mate. In *In re Estate of Megginson,* 21 Or. 387 (28 P. 388, 14 L. R. A. 540), and *Ollschlager's Estate v. Widmer,* supra, the presumption excused the party from producing proof that the individual who conducted the marriage ceremony had authority to perform it. In *Murray v. Murray,* 6 Or. 26, the executrix of the alleged widow (Winnifred) of John Murray, deceased, was excused from proving a ceremonial marriage by presuming one in her favor. The presumption was based upon the following: The testimony of the children of the alleged

union that Winnifred and John conducted themselves as husband and wife, that the two regarded the children as their own, that John had always supported Winnifred, and an affidavit of the defendant wherein she swore that she knew that John and Winnifred were husband and wife. Both were dead when the court engaged in the presumption.

In this case, whether the plaintiff and French married is dependent entirely upon whether they exchanged promises in Idaho to become husband and wife followed by consortium, and, as already indicated, all of the light which evidence could throw upon that issue is before us. By virtue of § 9-807, Oregon Code 1930, subd. 30, the fact that a man and a woman demeaned themselves as husband and wife authorizes a presumption that they were legally married; but this presumption is available only when the evidence indicates that the two whom it is claimed were married deported themselves as husband and wife. When, as in the instant case, the relationship is illicit in its inception, no presumption of marriage is permissible and the unlawful cohabitation is presumed to continue: Keezer on Marriage and Divorce (2d Ed.) § 136. The burden of proving that it was terminated with a marriage rests upon the party so asserting: Keezer on Marriage and Divorce (2d Ed.) § 137, and 38 C. J., Marriage, p. 1328, § 103. Since proof capable of justifying a presumption of marriage must indicate a dwelling together as husband and wife, evidence which shows no more than illegal cohabitation does not suffice. Although parts of the plaintiff's testimony may be suspectible to an interpretation that she and French cohabited as husband and wife, other parts indicate nothing more than a meretricious relationship. In fact, she admitted that

they had done nothing more in Idaho than live together. Evidence of this type cannot serve as a foundation for the desired presumption: *McBean v. McBean,* 37 Or. 195 (61 P. 418).

■ Presumptions operate when the preliminary facts demanded by them have been established, and when the party to be favored has not himself negatived the fact which he asks judge and jury to presume. When the fact otherwise presumable is negatived by proof, free from question and contradiction, no room remains for a favorable presumption, and neither court nor jury are at liberty to engage in one: *Lehl v. Hull,* 152 Or. 470 (53 P. (2d) 48, 54 P. (2d) 290); *Holland v. Hartwig,* 145 Or. 6 (24 P. (2d) 1023); *McDowell v. Hurner,* 142 Or. 611 (13 P. (2d) 600, 20 P. (2d) 395, 88 A. L. R. 578); *Judson v. Bee Hive Auto Service Co.,* 136 Or. 1 (294 P. 588, 297 P. 1050, 74 A. L. R. 944); *Nash v. Baun,* 124 Or. 485 (264 P. 846); *Kernin v. City of Coquille,* 143 Or. 127 (21 P. (2d) 1078). We realize that in the decisions just reviewed, with the exception of the last, the matter before the court was the propriety of engaging in an inference, or in what is sometimes called a presumption of fact; but we believe that the reasons mentioned in those authorities are equally applicable to a presumption of law.

■ We believe that in the instant case there is no room for a presumption that the plaintiff and French married. The plaintiff apparently placed all of the facts before the jury, leaving no missing item to be supplied by a presumption. If she omitted anything, then she suppressed the truth after swearing before the accident commission and in the circuit court to tell the whole truth. In both instances, besides presenting affidavits and pleadings, she testified freely and was

extensively cross-examined. Section 9-807 includes among our presumptions of law the following:

"5. That evidence willfully suppressed would be adverse to the party suppressing it, if produced;

"6. That higher evidence would be adverse from inferior being produced; * * *"

Section 9-2001 directs that "on all proper occasions" of which this would be one, if we are to presume that the plaintiff withheld facts, the jury must be instructed:

"Evidence is to be estimated, not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict; * * * if weaker and less satisfactory evidence is offered when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

Therefore, if it would be possible to assume that the plaintiff withheld the truth in order to gain the favor of a friendly presumption, these laws require that she become the victim of her own wrong. But we do not believe that truth has been suppressed. We are undoubtedly required to believe that she has given the full truth. That being true, as already stated, there is no room for a presumption. In the ordinary activities of life men do not presume when they know all of the facts. In the transaction of judicial business the same routine should be followed. Justice cannot be facilitated by giving one side of an issue the benefit of a make-weight and by placing a handicap upon the other side. We now quote from *Mockowik v. Railroad,* 196 Mo. 550 (94 S. W. 256):

"Learned counsel somewhat rely upon the proposition that plaintiff had the right to presume that de-

fendant was obeying the ordinances and governed his actions accordingly. Considering this insistence, it may be said this is not a case where the accident happened in the nighttime and where plaintiff could not see and advise himself by the exercise of ordinary care of the presence, let alone the speed of the engine. Nor is this a case where plaintiff was killed, so that what he knew and what he relied on as controlling his conduct died with him, and hence could not be shown. In such case as that because of the presumption of a love of life and because of a presumption that a rational being would take ordinary care to avoid danger, the law in its blandness indulges other presumptions, and one of them is that it will be presumed that the decedent trusted, as he had a right to trust, that defendant was running its engine in obedience to speed ordinances and that such decedent regulated his movements accordingly. (Hutchinson v. Railroad, 161 Mo. 1, c. 254, and cases cited; Riska v. Railroad, 180 Mo. 168; Weller v. Railroad, 164 Mo. 180; Sullivan v. Railroad, 117 Mo. 214.) But will the law indulge presumptions where all parties to the actual occurrence are alive and go upon the stand and the facts are fully disclosed? If plaintiff knew of the ordinances and relied on the fact that defendant was obeying their provisions and acted on that reliance, could he not have said so? Under such conditions, reliance would seem to be a fact susceptible of proof as are other facts, and should be proved by the best evidence of which the case would admit. He of all men knew what the facts were, and, having declined to speak, may he invoke the aid of friendly presumptions? 'Presumptions', as happily stated by a scholarly counselor, *ore tenus,* in another case, 'may be looked on as the bats of the law, flitting in the twilight but disappearing in the sunshine of actual facts.' That presumptions have no place in the presence of the actual facts disclosed to the jury, or where plaintiff should have known the facts had he exercised ordinary care, is held in many cases, of which samples are, Reno v. Railroad, 180 Mo. 1, c. 483; Nixon v. Railroad, 141 Mo. 1, c. 439; Bragg v. Railroad, 192

Mo. 331. To give place to presumptions, on the facts of this case, is but to play with shadows and reject substance.''

From *Landau v. Pacific Mutual Life Insurance Co.*, 305 Mo. 542 (267 S. W. 370), we quote:

''The basis of that ruling was the fact that the evidence was entirely circumstantial. In the case at bar the occurrence that resulted in the insured's injuries and death, together with all the attending circumstances, was first minutely described by an eyewitness called by the plaintiff, and then by two called by defendant. The facts and circumstances so detailed by them cannot be said to be so equivocal in character as to preclude a finding on them unaided by presumption, as was the case in Griffith v. Casualty Co., 290 Mo. 455. On the contrary they signify very definitely that the action of the insured in his every movement until he finally committed himself to the unrestrained force of gravitation was wholly voluntary. With such evidence in the record the legal presumption against suicide had no place in the case for any purpose whatever.''

If the jury believed that the plaintiff and French cohabited as man and wife after agreeing to become such, it was their duty, as the instructions clearly told them, to answer "yes" to the question submitted to them which is quoted in the paragraph preceding this opinion. If they did not so believe, it was their duty to answer "no". The latter was their answer. When the plaintiff placed before the jury all of the facts she precluded the necessity of resorting to presumptions. By giving a full narrative and withholding nothing she waived the benefit of the presumption that might otherwise have been available. We are satisfied that this assignment of error reveals no merit.

■ The remaining assignment of error is based upon a contention that a judgment should have been entered

in favor of the plaintiff notwithstanding the jury's verdict. As indicated in the paragraph preceding this opinion the jury answered "no" to a question which inquired whether the plaintiff and French had contracted a common-law marriage in the state of Idaho. The plaintiff, as is indicated in the excerpts taken from her testimony, many times contradicted herself. That being true, we are not at liberty to disturb the jury's finding.

It follows that the judgment of the circuit court must be affirmed.

BEAN, C. J., and BELT, J., concur.

———

KELLY, J. (specially concurring). "A presumption is a deduction which the law expressly directs to be made from particular facts.": Section 9-803, Oregon Code 1930. The writer is of the opinion that the disputable presumptions declared in section 9-807, ibid, are available in all cases where the particular facts appear in the record from which the statutorily-prescribed deductions are to be made, except only where such presumptions are overcome by opposing evidence or broken in upon by a countervailing presumption: *Consor v. Andrew*, 61 Or. 482, 491 (123 P. 46).

Whether in a given case an appropriate presumption has been overcome, is a question for the triers of fact, and "they are not bound to find in conformity with the declarations of any number of witnesses which do not produce conviction in their minds against a less number, or against a presumption or other evidence satisfying their minds.": Section 9-2001, ibid.

The writer is in accord with the letter of the foregoing statutory excerpt in that he thinks that a pre-

sumption is a species of evidence. It is more than a mere direction as to which party shall proceed.

The only Oregon case cited in the opinion of the court upon the import of a presumption of law is *Kernin v. City of Coquille,* 143 Or. 127 (21 P. (2d) 1078). In that case there was no issue upon the subject of the presumption sought to be invoked. In the view of the writer, in all cases, where an issue of fact is presented for the consideration of a jury, the presumption or presumptions of law pertinent to such issue should be made known to the jury. In such cases the jury and the jury alone are the ones authorized by law to determine whether relevant presumptions may be treated as bats in a bellfry or beautiful birds bearing timely tidings of truth.

In the case at bar, it is the opinion of the writer that the failure of the trial court to instruct upon the presumption "that a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage", constituted error; but, because of the character of the testimony of plaintiff herself, such error was not reversibly prejudicial.

The writer concurs in the result.