Argued October 10, affirmed October 23, 1957

# GORMAN *v.* GORMAN

316 P. 2d 543

*Frank P. Santos,* Oregon City, argued the cause for appellant. With him on the briefs was Glenn R. Jack, Oregon City.

*Charles R. Spackman,* Portland, argued the cause for respondent. On the brief were Pendergrass, Spackman & Bullivant, Portland.

Before PERRY, Chief Justice, LUSK, WARNER and KESTER, Justices.

WARNER, J.

The above matter comes to us framed as a proceeding for a declaratory judgment determining whether or not a valid marriage subsists between the plaintiff, whom we will call Klara, and the defendant, whom we will refer to as the doctor. From a decree denying the existence of a valid marriage between the parties, the plaintiff appeals.

This proceeding has its origin in the irregular relations of the parties beginning in 1929. They continued to 1954 with but a few interruptions in the time that the parties were living in Europe and the United States. This history of the parties in their joint lives was appropriately denominated as bizarre in appellant's brief. We think that no good purpose will be served in its detailed extension beyond a general understanding of some of the significant circumstances involved.

The doctor was schooled in the practice of medicine and surgery and had special training in public health and preventative medicine. When he first met Klara, in Warsaw, Poland, he was, and for a goodly part of the term of their intimate acquaintance, a member of the U. S. Public Health Service, and then attached to the U. S. Consulate in that city as a technical advisor. Klara had only seven months of schooling and at the age of nine was sent by her parents to work in a Polish weaving factory. Her record thereafter and prior to meeting the doctor was one of continuous hard work in menial employments. She entered his service as a housekeeper in 1929, at the age of 31, and so far as the outside world knew continued in that capacity until 1954. Shortly after she entered the doctor's home in Warsaw, she was the object of the doctor's amorous attentions. We are persuaded that their meretricious

conduct began in 1929 and continued thereafter wherever the doctor was stationed. We take heed of his protestations that they were purely platonic and that Klara served him only as a housekeeper, but are not so convinced.

In 1931 the doctor's duties took him to Glasgow, Scotland, where they moved and lived. Scotland was the situs of the marriage upon which Klara relies.

Later, the doctor was transferred to two different places in Germany, but in 1934 his duties took him back to the United States. Sometime in 1935, and not long after leaving Germany, he made arrangements for her to follow him to this country as she did. This included the payment of Klara's expenses. In the United States they lived for various periods at the places of his official station in the states of Louisiana, Texas and California. Subsequently, they established themselves in Arizona. There the doctor purchased and operated for about five and one-half years a large cattle ranch. Following that, there was a stay in Washington, and finally they came to Oregon in 1947, where the doctor acquired and presently owns property in Clackamas County and where he now resides. During this entire time Klara continued to function as his housekeeper and was so known to their friends and neighbors. No children were born to this misalliance.

According to Klara, the parties affected an irregular marriage under the laws of Scotland during their stay there in 1931. She depends upon the law of that country as the basis for her claim of a marital union between herself and the doctor.

The law of Scotland as it then was recognized a marriage without the benefit of ceremony if it could be established that a subsequent copulation was had on the faith of a promise of marriage made as an in-

ducement to the sexual act which followed. The promise, however, had to be proved by the oath or by a writ (in Scotch law, a writing. Black's Law Dictionary (4th ed) p 1783) of the promissor. Furthermore, there had to be a residence in Scotland by one of the parties for at least 21 days before the alleged promise was made. Scotch authorities supporting the foregoing statements are: 9 Encyclopaedia of the Laws of Scotland, p 412 § 933; *Mackie v. Mackie,* 1917 SC 276; *Lindsay v. Lindsay,* 1927 SC 395; *M v. Y,* 1934 SLT 187. "The promise must be proved by the writ of the defender. Specific words of promise are not necessary provided that the writings can bear the inference of a promise. The writings must be proved to be genuine and to have been delivered. The writ will be considered in the light of the whole circumstances and the actings of the parties. * * *" 9 Encyclopaedia of the Laws of Scotland, supra, § 935, citing *Murray v. Napier,* 1861, 23 D 1243; *Lindsay v. Lindsay,* supra; *Mackenzie v. Stewart,* 1848, 10 D 611, 638. It is Klara's position that the doctor made an oral promise to her on two different occasions while they were living in Glasgow, each of which was followed by intercourse.

■ At the outset plaintiff confronted with the following pertinent rule: when the relationship is illicit in its inception, no presumption of marriage is permissible and the unlawful cohabitation is presumed to continue. The burden of proving that the illicit relation was terminated with a marriage rests on the party asserting it. *French v. State Industrial Accident Commission,* 156 Or 443, 454, 68 P2d 466; *McBean v. McBean,* 37 Or 195, 204, 61 P 418; Keezer, Marriage and Divorce (3d ed) § 740, p 783, § 741, p 784; 55 CJS 898, Marriage § 43d(2); 35 Am Jur 312, Marriage § 200 and p 314 § 203.

■ We find that Klara has not brought herself within the ambit of this rule. This is specifically true in so far as it relates to Klara's reliance on a marriage in Scotland. A careful examination of the record fails to reveal evidence of the character warranting a holding that the parties ever brought themselves within the purview of the Scotch law. She tenders no evidence of a written promise from the doctor, nor in the alternative, the oath contemplated by the law of Scotland. Among other things, in cross-examination Klara is vague in her testimony and had difficulty remembering if there was a promise of marriage made in Scotland before her intercourse there or whether the promises had been made while they were yet in Poland. She also said, referring to incidents occurring in the United States in 1937, "I was waiting for him to set the time to marry."

Moreover, her own conduct after coming to the United States tends to contradict her late claim, first made in 1954, that she had prior to that time ever believed that she and the doctor enjoyed the legal status of husband and wife.

Her own brief frankly and correctly declares: "that never at any time during the twenty-three or twenty-four years the parties were together did Klara identify herself as Mrs. Gorman, never told anyone she was Dr. Gorman's wife, never told anyone her name was Mrs. Gorman" and "never was identified by Dr. Gorman as his wife, never at any time introduced Dr. Gorman as her husband until about April of 1954."

We find, too, that during the same period she had occasion to execute many documents of importance, some of which necessitated making oath as to the truth of the statements contained therein. All were signed by her as a single woman, wherein she used her maiden

name, Olszewska. Included in the writings of this type were her passports when travelling from Poland to Scotland, Scotland to Germany and from Europe to the United States; nine federal or state tax returns; her safe-deposit box signature card; various stocks and bonds owned by her; her bank savings deposit card; and her naturalization and alien registration papers. See Keezer, Marriage and Divorce, supra, § 738, p 779.

Another relationship to which we give some weight is: Klara had been reared as a member of the Catholic faith and by her own statement was a good Catholic and attended church every Sunday. The Catholic Church is one of the religious denominations which places a very high value on marriage and the continuity of such union. Her church affiliation offered her opportunities for advice and counsel upon the desirability of marriage and the urgent need for a marital status which would receive the recognition and approbation of both her church and the civil law. All of this could have been accomplished free from the knowledge or influence of the doctor's presence if she was as interested in marrying the doctor as she claims.

Under all the circumstances presented on this appeal, we cannot avoid the conclusion that Klara's representation of an irregular marriage according to the Scotch law as it was during her short stay in Glasgow comes as an afterthought.

Affirmed without costs to either party.