CHARLOTTE KOBOGUM ET AL. v. THE JACKSON IRON COM-
PANY.

[See 49 Mich. 39; 50 Id. 578.]

*Trusts—Certificate of interest in mining company—Indian marriages
—Polygamy.*

In 1845 an *unincorporated* association was formed at Jackson, Mich-
igan, for the purpose of mining on Lake Superior, and under its
authority its president and secretary executed and delivered to
an Indian, in consideration of services rendered by him in look-
ing up a location which the company had leased under existing
laws, a paper in which they certified that he was entitled to
"twelve undivided thirty-one one hundredths parts of the inter-
est of said mining company in said location." In 1848 the asso-
ciation was incorporated by special act of the Legislature, and at
an early meeting of the *new* corporation inquiry was made con-
cerning the Indian's interest, and information was given of said
certificate, and a resolution was unanimously adopted reciting
the issue of said stock, which was treated as unassessable, and
directing a committee to report some provision for issuing stock
certificates to the holder or his assigns; but no further steps were
ever taken, nor was the Indian notified of the action taken. In
1877 a *new* corporation succeeded to the assets and liabilities of
the old one, in the organization of which the interest or claim of
the Indian stockholder was ignored, prior to which ·time there
had been no corporate repudiation of said claim, nor was the cer-
tificate ever surrendered to *either* company. The Indian died
about the year 1857, leaving children by two wives, with whom
he lived at the same time, under a form of marriage considered
lawful by Indian usage, all parties sustaining, up to the time of
his death, tribal relations. These children filed a bill against the
*last-named* corporation to secure a declaration of their rights in
the premises, and a deed of the interest of their father under
said certificate, and for other relief, and in affirming the decree
of the court below, granting the relief prayed for, the Court held:

1. That the document given to the father gave him an *equitable* title
to the share therein mentioned of the location therein described,
and, being absolute, represented *full paid,* and for that reason
*unassessable,* shares.

2. That the present defendant, when organized, stepped into the shoes of the former company, and became bound by the *trust* relation existing when the first corporation was organized, and which it is held had not been extinguished.

3. That the marriages, being between members of an Indian tribe in tribal relations, were unquestionably good by the Indian rules; and the parties not being subject in those relations to the laws of Michigan, and there being no other law interfering with the full jurisdiction of the tribe over the personal relations of its members, the court cannot interfere with the validity of such marriages without subjecting them to rules of law which never bound them.

4. The following propositions are summarized from the opinion of Mr. Justice CAMPBELL:

*a*—There is no law which terminates the interest of a stockholder without some *adverse* action asserting its extinction or denying its existence, or which compels him to seek aid from the courts when no such adverse possession is taken.

*b*—While we do not find it necessary to hold that *no* lapse of time will exonerate a trustee, it is not equitable to favor such discharges of responsibility beyond their merits, where there has been no actual fault in the delay.

*c*—The United States Supreme Court and the state courts have recognized as law that no state laws have any force over Indians in their tribal relations. [See authorities cited in opinion, page 507.]

*d*—While most civilized nations in our day very wisely discard polygamy, and it is not probably lawful anywhere among English speaking nations, yet it is a recognized and valid institution among many nations, and in no way *universally* unlawful.

*e*—It is a principle of universal law that marriages valid by the law governing *both* parties *when made* must be treated as valid everywhere.

Appeal from Marquette. (Grant, J.) Argued February 1, 1889. Decided October 18, 1889.

Bill filed to declare complainants' rights in a mining property, and secure a deed of the same, and for other relief. Defendant appeals from a decree granting the relief prayed for. Affirmed. The facts, and points of counsel *passed* upon by the Court, are stated in the opinion.

*F. O. Clark* (*Isaac Marston,* of counsel), for complainants.

*W. P. Healy* (*C. I. Walker*, of counsel), for defendant.

CAMPBELL, J. This litigation is substantially the same that was once before this Court in the name of Jeremy Compo as complainant. 49. Mich. 39 (12 N. W. Rep. 901)'; 50 Id. 578 (16 N. W. Rep. 295). Mr. Compo having held the title of Charlotte Kobogum for her benefit, has reconveyed it to her, and the other complainants come in under the suggestion of this Court that they were necessary parties, and all now sue jointly. Except as to their title, there is no important change in the facts. The circuit court for the county of Marquette gave a decree in favor of complainants, and defendant appeals. As the facts have been referred to sufficiently in the former case to make the nature of the controversy understood, it will not be necessary now to do more than give an outline of them.

In 1845, an unincorporated association was formed at Jackson, in this State, with the purpose of mining on Lake Superior, the country not having then been surveyed. The Indian title had been ceded by treaty promulgated in March, 1843, and the Indians were thereby allowed to remain in occupancy of the mineral lands until otherwise ordered by the President. Upon other lands they were also to remain until removed; and some subsequent treaty provisions, not here important, were adopted for their benefit. The treaty of Fond du Lac, of 1826 (Indian Treaties, 290), had authorized the government to search for and take out minerals, with an express saving that it should not affect title or jurisdiction. By some regulation which was probably military or executive, the supervision of these lands had, sometime after 1843, been placed in the war department, and at this time mining permits were issued by that department, on which renewable leases were given until legislation should be passed on the subject. By act of Congress of March 1, 1847, the persons holding permits or leases were authorized, as soon as the

lands should be surveyed, to purchase their locations at $2.50 per acre, the minimum price to all others being $5; and the lands, leased or not leased, were transferred from the war to the treasury department. 9 U. S. Stat. 146. This same act, for the first time, provided for the creation of a new land district, and a geological survey and designation of the mineral lands, before the public lands should be brought into market, contemplating considerable delay in the completion of land titles.

The Jackson Company sent up persons to explore and secure mining lands. These gentlemen heard there was a valuable iron deposit, of which one Lewis Nolan, a half-breed, knew something. Not being able to find it, they were recommended to go to L'Anse, and find an Indian chief, named in the record "Marji Gesick," in whose territory the land lay, and who could take them directly to it. Without making any definite bargain about his pay, they told him he would be rewarded; and he went with them, and took them to a remarkable and valuable iron bluff or mountain, since known as the "Jackson Mine," near Teal lake. This was immediately located in the name of James Ganson under a permit held in his name for the company; and his selection, dated October 4, 1845, was approved by the mineral land superintendent, Col. John Stockton, on the fifth of December in the same year, and a lease granted. In process of time, the mineral lands were surveyed; and on September 21, 1850, while the law of 1847 remained unchanged, the land was paid for, and patent issued to the incorporated Jackson Iron Company, claiming under the Ganson lease, which was the only method of entry then allowable on those terms.

After the land had been secured under the permit and location, the president and secretary of the association, Abram V. Berry and Frederick W. Kirtland, acting, as Mr. Berry says, under direct authority of the association, gave to Marji Gesick this document:

"RIVER DU MORT, LAKE SUPERIOR, May 30, 1846.

"This may certify that in consideration of the services rendered by Marji Gesick, a Chippewa Indian, in hunting ores of location No. 593, of the Jackson Mining Company, that he is entitled to twelve undivided thirty-one one-hundredths parts of the interest of said mining company in said location No. 593.

"A. V. BERRY, Pres.

"F. W. KIRTLAND, Secy."

It is testified that there was a further understanding that his son, a brother of complainant Charlotte, should be educated, but his death by drowning prevented. He also was allowed a suit of clothes and some other trifling articles.

This paper was retained by Marji Gesick, and was found some time after his death in a box containing some of his possessions by his daughter, Charlotte Kobogum. Neither he nor any of his family or relatives could read or write. Francis Nolin, a Cree half-breed, who had married a Chippewa woman related to Charlotte, testifies that they were talking about the iron location, and Kobogum showed this paper, which they thought related to it, and, for the purpose of finding out, showed it to Mr. Everett, one of the original parties who had dealt with Marji Gesick, and Mr. Everett made an endeavor to get matters righted in her behalf.

In 1848, the Jackson Iron Company, or Mining Company, became incorporated by special act of the Legislature, under the name of the Jackson Mining Company, for 30 years from April 3, 1848. Laws of 1848, p. 337. At one of the early meetings of the new corporation, inquiry was made concerning the reservation of 18 shares of unassessable stock for the Indians, and the meeting was informed of the certificate given to Marji Gesick by Berry and Kirtland, and to other Indians not named. A resolution was then unanimously adopted reciting the issue of 18 shares of unassessable stock to the Indians, and directing a committee to report some provision for issuing stock certificates to them or their assigns.

No further steps were ever taken, and nothing was ever said to Marji Gesick about it.

In August, 1877, in contemplation of the approach of the end of the charter of the corporation, resolutions were adopted for the transfer of the assets to a new organization, and that all debts, demands, and liabilities existing against the old corporation should continue against the new one. Defendant is that successor. It appears that at that time the officers, and all but one of the directors, resided in other states; and that as early as 1864, and apparently earlier, the books and business arrangements were all in New York city, where the president and other officers were located.

Marji Gesick died near Marquette at a time not ascertainable by reason of the inability of the Indians to fix it definitely by our methods. It was apparently in 1857, or thereabouts. He left children by two wives. Charlotte Kobogum was his daughter by a wife of full blood, to whom the American name of Susan is given in the record. The other complainants are son and granddaughter of another daughter of a wife named Odonebequa. All of these persons were Indians belonging to the Chippewas, and in the Indian tribal relations, and the marriages were before the cession of any of the Lake Superior lands by treaty. The testimony shows that the wives were considered lawful wives, and the children lawful children, by the Indian usages, and so recognized by Marji Gesick.

The document given by Marji Gesick gave him an equitable title to the share therein mentioned of the location described. It appears to have corresponded in its subdivision to 12 shares in the enterprise, and, as it is absolute, would have represented full-paid shares, and therefore unassessable, and was so regarded by the corporation when organized. It is equally manifest that until changed into share certificates, which might be done by mutual agreement, it must stand as an undivided interest in that location, and in nothing else but that.

and whatever may have been obtained as a result of working the mine. When this controversy arose, it included a large amount of accrued profits. These complainants, if heirs of Marji Gesick, would have a right to their share in the property and its results, unless barred by some rule of law. The only questions of any account are whether they are heirs, and, if so, whether they have lost their rights. The court below decided in their favor, and gave them relief, and unless there was error in so doing the decree must be sustained.

The first question to be considered is whether they have lost their rights. It is claimed the rights have been lost by laches. There is no statute of limitations in the way; and the question is whether the rules of equity, by analogy or otherwise, have barred the right to have relief.

The present defendant, when organized, stepped into the shoes of the former company, and became bound by the trust relation, if one then existed. That one existed when the first corporation obtained title is very clear, and, if now extinguished, the inquiry must be when and how the trustee became authorized to disregard the beneficiary.

As already noticed, Marji Gesick was recognized by name on the records of the corporation as holder of a certificate entitling him to a paid-up interest in the company, and a committee was appointed to provide for giving him new evidences of it. The recognition was unconditional and absolute. The records do not show that any further action was ever taken. The continued possession of the certificate shows that it was never surrendered. It does not appear that Marji Gesick was ever notified to change his papers. He could not, on such an interest, be required to pay any assessments. Nothing further was needed on his part to inform the corporation of his rights, and there were no steps necessary, at law or in equity, so long as his rights appearing of record were not repudiated. If dividends were earned, and proper notice given of them, the lapse of time might act on

their recovery. But it is difficult to see what other effect could be created or could follow.

The corporation held all its property in trust for the parties interested; and whether treated as equitable tenants in common, or as stockholders, could make no particular difference. There is no law which terminates the interest of a stockholder without some adverse action asserting its extinction or denying its existence, or which compels him to seek aid from courts when no such adverse position is taken.

The first time when any pretense was set up against this interest must have been, if at all, when, in 1866, Mr. Everett called the attention of Mr. Stewart, the president of the company, to the paper given to Marji Gesick. We are disposed to believe the claim that Mr. Stewart proposed or promised to lay it before the directors. Whether he so promised or not, it was his legal duty to do so, and he had no official authority to subject the corporation to the consequences of a refusal. His attempt to get rid of the claim by a small sum of money would no doubt have inured to the benefit of the company, had it succeeded. But he admits he expected the paper to be given up for any sum which he gave, and which was accepted. This would have been a compromise, and not a gift. It appears affirmatively that he said nothing to the corporation or its directors about this claim; and it also appears that he saw, or should have seen, the record of its recognition. Whether he represented the company or not, there was then, at least, no corporate repudiation.

The next claim was made in 1871 by Mr. Mapes, and led to no more definite results. It cannot be said that there was ever any repudiation of the claim until 1877, when, in the new organization, it was ignored. Since that time it cannot be urged that there has been any such laches as ought to interfere with equitable relief. Charlotte Kobogum's rights were put in litigation almost immediately, and the case

reached this Court by appeal on demurrer, and was argued in June, 1882. The other complainants were both infants in 1877, if the girl was then born. There has never been any acquiescence in the denial of their rights; and, unless some inflexible rule of law requires it, the courts should not go out of their way to cut off ignorant people like these, who are outside of the ordinary laws and habits of the whites. It was held in the case on demurrer, by a majority of the Court, that there was no such legal difficulty. And, inasmuch as it has been several times decided by us that equity will deal with each case on its own facts, there should be no unreasonable distinction of equities. The cases of *Ingersoll v. Horton,* 7 Mich. 405, and *Abbott v. Godfroy,* 1 Id. 182, go so far beyond the delays in this case as to render discussion needless.

It must be remembered, further, that this is a case where a trustee, with notice on its own records of Marji Gesick's rights, is seeking to get rid of his rights. While we do not find it necessary to hold that no lapse of time will exonerate a trustee, it is not equitable to favor such discharges of responsibility beyond their merits, where there has been no actual fault in the delay.

In view of the corporate recognition, we can give no weight to the fact that, after they had got the benefit of Marji Gesick's services, some, and perhaps several, parties were displeased with the arrangement to pay him. If they were, they ought to have been ashamed of it. If he had been a white man, no one would have regarded him as entitled only to such a small share in the discovery due to his information, and which no white guide ever would have accepted. The uselessness of the ordinary compass enhanced the difficulties of exploring. It is undoubtedly true that Indians may be easily led to make bad bargains, and, when made, usually stick to them. But this bargain was actually made, and it cannot be held that, because Marji Gesick might per-

haps have been induced to give it up as of no great supposed value to him, he and his heirs ought to be deprived of it altogether. It is certain that he held on to it, and that there was an idea in the family that they had some interest in the iron mine. He was never asked to give it up, and he never gave it up.

The only question remaining is whether Marji Gesick's interests passed to his descendants recognized by the Indian laws and usages. If they did, there is no doubt of the rights of these complainants. Upon this question enough was said in the opinion in 50 Mich. 578, to render full discussion unprofitable.

The United States Supreme Court and the state courts have recognized as law that no state laws have any force over Indians in their tribal relations. *Kansas Indians,* 5 Wall. 737; *New York Indians,* Id. 761; *U. S. v. Kagama,* 118 U. S. 375 (6 Sup. Ct. Rep. 1109); *U. S. v. Holliday,* 3 Wall. 407; *Dole v. Irish,* 2 Barb. 639; *U. S. v. Shanks,* 15 Minn. 369; *Hastings v. Farmer,* 4 N. Y. 293; *Cherokee Nation v. Georgia,* 5 Pet. 1; *Worcester v. Georgia,* 6 Id. 515; *Wall v. Williamson,* 8 Ala. 48; *Wall v. Williams,* 11 Id. 826; *Morgan v. McGhee,* 5 Humph. 13; *Johnson v. Johnson,* 30 Mo. 72; *Boyer v. Dively,* 58 Id. 510; *Tuten v. Byrd,* 1 Swan, 108; *Jones v. Laney,* 2 Tex. 342.

There was not, during any of the period involved in these inheritances, any law or treaty of the United States on the subject of Indian marriages, or in any way interfering with Indian usages on the subject. The testimony now in this case shows what, as matter of history, we are probably bound to know judicially, that among these Indians polygamous marriages have always been recognized as valid, and have never been confounded with such promiscuous or informal temporary intercourse as is not reckoned as marriage. While most civilized nations in our day very wisely discard polygamy, and it is not probably lawful anywhere among English

speaking nations, yet it is a recognized and valid institution among many nations, and in no way universally unlawful. We must either hold that there can be no valid Indian marriage, or we must hold that all marriages are valid which by Indian usage are so regarded. There is no middle ground which can be taken, so long as our own laws are not binding on the tribes. They did not occupy their territory by our grace and permission, but by a right beyond our control. They were placed by the Constitution of the United States beyond our jurisdiction, and we had no more right to control their domestic usages than those of Turkey or India.

The treaties made between the United States and this very tribe, which are quite numerous, all recognize heritable relations among them, and in many instances, familiar to all old residents of the country, provided for the Indian families of persons who had other families; recognizing the Indian nation as entitled to say who should share in tribal benefits. As white men cannot withdraw themselves from state law, we should have no great difficulty in determining their personal *status*. But Indians who were members of their tribes were not obliged or authorized to look to state law in governing their own affairs. The decisions in Alabama, Tennessee, Missouri, and Texas, above cited, all sustain the right of Indians to regulate their own marriages, and there is no respectable body of authority against it. On the contrary, it is a principle of universal law that marriages valid by the law governing both parties when made must be treated as valid everywhere. Even the English courts, which assert some extra-territorial power over Englishmen which is contrary to our American rules, have never doubted this doctrine. They have held for peculiar reasons that their ecclesiastical law did not usually operate on any marriages not governed by English law; but at the same time it has been held that, except for these peculiar reasons and these peculiar cases, marriages under other laws must be recognized as governed by the law

of the place.   There is no doubt that any rule which holds that a man is lawfully married to one wife at one place, and to another at another place, is more in favor of polygamy than against it.   And this is the direct result of some of the European decisions, like that upon the Jerome Bonaparte marriage, as well as some English decisions.   It is entirely intelligible that a system of procedure, operating directly on married parties, to compel them to observe their mutual relations, is not consistent with plural or dissoluble marriages, and it has been so held.   In *Ardaseer Cursetjee v. Perozeboye,* 6 Moore, Ind. App. 348, it was held that Indian marriages did not come within the jurisdiction of the ecclesiastical courts; but it was admitted they were valid, and that the courts created in India to administer Indian laws would recognize and enforce all rights arising under them.   In the notes it appears that this case seems to have involved a great deal of litigation, and there is no doubt that the particular questions passed on by the privy council were correctly decided

So, in *Lindo v. Belisario,* 1 Hagg. Const. 216, and *Goldsmid v. Bromer,* Id. 324, and *Ruding v. Smith,* 2 Hagg. Const. 371, the distinction between the validity of marriages, and the applicability of certain remedies to them, is well defined.   And see Guthrie's edition of Savigny's Private International Law, 18–20, for further explanations concerning the laws of separate tribes.

We have here marriages had between members of an Indian tribe in tribal relations, and unquestionably good by the Indian rules.   The parties were not subject in those relations to the laws of Michigan, and there was no other law interfering with the full jurisdiction of the tribe over personal relations.   We cannot interfere with the validity of such marriages without subjecting them to rules of law which never bound them.

We think the complainants are the lawful holders of Marji Gesick's interest, and that the decree should be affirmed.

The other Justices concurred.