MATTER OF K—W—S—

In VISA PETITION Proceedings

VP 13–I–46768

*Board Decision October 31, 1958*
*Board Decision April 10, 1961*
*Decided by Attorney General August 7, 1961*

Preference quota status—Section 203(a)(4)—Half brothers and sisters—Legitimacy of children born to Chinese concubine.

Son of Chinese father and concubine living in his household is regarded as legitimate under Chinese law and entitled to fourth preference quota status upon petition filed by half sister (naturalized citizen) who is the child of the same father and his wife.

BEFORE THE BOARD
(October 31, 1958)

DISCUSSION: The case comes forward on appeal from the order of the District Director, San Francisco District, dated September 12, 1958, denying the visa petition on the ground that the petitioner has failed to satisfactorily establish the relationship claimed.

The petitioner, who was born at Kwong On Village, Hoi Ping, Kwangtung, China, on October 18, 1914, was naturalized in the United States District Court at San Francisco on January 24, 1956. She seeks fourth preference status under section 203(a)(4) of the Immigration and Nationality Act on behalf of the beneficiary, W—Y—Y—, also known as W—C—C—, her alleged half brother, who was born at Kwong On Village, Hoi Ping, Kwangtung, China, on June 22, 1929.

The petitioner sets forth that she is the legitimate daughter of W—Y— and his wife, S—Y—Y—. The beneficiary is stated to have the same father, W—Y— (also known as W—D—Y—, W—F—H—, W—D—J— and W—Y—H—), but had a different mother, K—K—S—.

According to the letter submitted by counsel in connection with the appeal, the petitioner and beneficiary have the same father but the petitioner is a child by her father's principal wife; whereas, the beneficiary is a child by the same father through a concubine. It is alleged that under Chinese law, children born in China by

396

concubines are considered legitimate children. In support of the relationship there has been submitted a photograph claimed to have been taken in 1941 of the petitioner with her mother, three of her own brothers, and children of two of her brothers. This picture does not include the beneficiary. A second photograph taken around 1949 shows two of the petitioner's own brothers, two half brothers, one of whom is the beneficiary, a nephew and a friend. A third photograph taken in 1954 of the petitioner's brother, Y—L—W—, who also appears in the other two photographs, also includes his wife and his six children, two sons of the petitioner's oldest brother, Y—H—W—, and the beneficiary of the petitioner, Y—Y—W— (C—C—W—), and his full brother, Y—S—W—. It is not clear how these photographs establish the claimed relationship, and their probative value would appear to be doubtful.

In addition, there has been submitted an affidavit of Y—L—W—, a full brother to the petitioner, corroborating the claim of the petitioner that the beneficiary is the half brother of himself and his sister, having the same father but that the beneficiary, W—Y—Y— (W—C—C—) is the younger of two sons of his father by a concubine, K—K—S—; and setting forth that when the affiant was seen at the American Consulate General in Hong Kong he gave a statement to the consul regarding his brothers and sisters, inclusive of the children of his father and his concubines; and that this information is included in his file at the American Consulate General. There has also been submitted a second affidavit executed by T—C—D— (T—H—K—), a friend of the family, to the effect that he knows of his own knowledge that W—W—, with aliases, is the father of K—W—S—, the petitioner, and of W—Y—Y— (W—C—C—), the prospective immigrant, and that the latter is the son of W—Y— by his concubine K—K—S—.

Section 203(a)(4) of the Immigration and Nationality Act provides a preference for brothers and sisters of citizens of the United States. The relationship may be that of the whole blood or half blood. Where the common parent is the mother, the offspring are regarded as half brother and half sister, whether or not legitimate, and a petition may be filed under section 203(a)(4). *Matter of C—*, 6—786. However, where the common parent is the father but different mothers are involved, the illegitimate child is not eligible for fourth preference as a half brother or sister under section 203(a)(4). *Matter of C—*, 5—610. Since the common parent in the instant case is the father, it becomes necessary for the petitioner to establish that the beneficiary is a legitimate half brother.

It is noted in the instant case the petitioner was born in 1914 and the beneficiary in 1929. The Library of Congress, Far Eastern

Law Section, has made available a memorandum of Chinese law governing domestic relations in China. The Chinese Civil Code was promulgated and put in operation in 1930. Prior to that date, all matters pertaining to domestic relations (with the exception of those concerning the Royal Family of the Emperor) throughout China were governed by the Imperial Code of the Tsing Dynasty, the Ta Tsing lu li (published by Imperial Decree in 1799). The Supreme Court (Ta li yuan) decisions also had the effect of law, especially in the absence of any provision in the Imperial Code. Under the Imperial Code a man could have only one wife, in spite of the fact that he could have more than one concubine. In short, the law recognizes the system of concubinage. It seems that the distinction between a wife and concubine is entirely dependent on whether the formality of the required customary marriage ceremony has been celebrated, because it is not necessary to have any ceremony to acquire a concubine. A concubine cannot become a wife of a man whose wife is still alive, even though the head of the family would express his intent to do so. Nevertheless, a concubine can attain the status of the wife of the man who has no wife when the family head expresses such intent; there is no fixed ceremony except the special customary practice which must be followed. Finally, it would appear that the system of concubinage under the Imperial Code of China could also be applied to include any situations similar to a common law marriage. As a matter of fact, a concubine under the Imperial Code is a woman who cohabits with a man permanently, but the customary formalities required for the celebration of a marriage have not been performed.

Under the provisions of the Imperial Code, the children of a concubine are not considered to be illegitimate. Any illegitimate child was then known as a "child of adultery" (Chian-sang-tsi), whose legitimation could be attained upon being recognized by the natural father. A decision of the Supreme Court (Ta li yuan) in 1914 states that if the natural mother of a child is the concubine of a man, her child is therefore an acknowledged child (Shu-tsi). Although the mother is not even a concubine, the father-and-child relationship (legitimation) can be accomplished by being recognized by the natural father during his lifetime. Consequently, the existence of father-and-child relationship shall be determined by evidence of whether there is such recognition (Shang No. 729; 1914). Similarly, an illegitimate child could become an acknowledged child after his natural mother became the concubine of his natural father, as illustrated by a court decision which reads that a "child of adultery" (Chian-sang-tsi) may attain the status of an acknowledged child upon his natural mother's achieving the status of a concubine of his natural father (Shang No. 1401; 1919).

These principles on legitimation, as enunciated in the above-mentioned Ta li yuan (Supreme Court) decisions and interpretations, have been incorporated in the Civil Code of the Chinese Republic promulgated and in force in 1930. For example, Article 1064 of the Civil Code provides that a child born out of wedlock whose natural father and mother become married to each other is deemed to be legitimate. Moreover, Article 1065 of the Civil Code states that a child born out of wedlock who has been acknowledged by the natural father is deemed to be legitimate; where he has been maintained by the natural father, acknowledgment is deemed to have been established. Inasmuch as the Chinese Civil Code does not recognize the system of concubinage, adequate protection is accorded to concubines and their children. Reference is made to the Judicial Yuan interpretation, which reads:

Under the Civil Code the status of a concubine is not provided, yet if she lives together with the head of the family with the object of permanent cohabitation, she is therefore deemed a member of the family. The status of her posthumous child shall be considered the same as that having maintained by his natural father (Yuan No. 735; 1932).

It is, therefore, seen that from the information supplied by the Far Eastern Section of the Law Division of the Library of Congress, the children of a concubine are not considered to be illegitimate since if it is established that the natural mother of the child is the concubine of the father of the child, her child is considered to be an acknowledged child and in view of such acknowledgment is deemed to be legitimate.

The petitioner is the subject of file C–7544040, which indicates that she was first admitted to the United States at the port of San Francisco on October 15, 1941, as a merchant's wife. She was interrogated under oath before a board of special inquiry upon the occasion of her admission and stated that her father was W—Y— or W—J—M—, 58 years old, connected with the Chinese Government; that her father had but one wife, who was her mother, S—S—, 58 years old, living at Kwong On Village, Hoi Ping District, that she had two older brothers and two younger brothers who were (1) W—Y—H—, 38 years old; (2) W—Y—L—, 36 years old; (3) W—Y—C—, 24 years old; and (4) W—Y—Y—, 23 years old.

A report of the District Director, San Francisco District, dated September 11, 1958, indicates that the petitioner was interviewed on September 19, 1958, and that the facts and allegations in her petition and relating files were verified by her. In the interview, the petitioner stated that she failed to report her half brother and her father's association with one of his concubines, K—K—S—, who was the mother of the half brother beneficiary, because she did not think it was right to do so. She testified that the petitioner

was living at home in the village and the home was two houses linked together, the wife and family living in one part and five concubines living in the other part. The petitioner stated that the mother of the beneficiary died about 10 years ago and that their father is also deceased.

The denial by the District Director of the visa petition on the ground that the petitioner has failed to satisfactorily establish the claimed relationship appears to be predicated on the fact that on the occasion of her admission to the United States on October 16, 1941, the petitioner failed to state that her father had any concubines and on the same occasion failed to claim that she had any half brothers. However, an examination of the interrogation of the petitioner at that time discloses that she was merely asked whether her father ever had more than one wife and that she replied "just one." This answer was correct since her father, in fact, had but one wife and had not been previously married. Concubines are not regarded as wives and the petitioner was not asked whether her father had any concubines. As far as any brothers, it appears that the petitioner named only her full brothers, the children of her parents, and did not name any half brothers or half sisters of whom there appear to be quite a number. The sworn statement of the petitioner in the present visa petition proceeding that the beneficiary is her half brother is corroborated by two affidavits, one submitted by her full brother and one submitted by a friend, and the full brother further states that he disclosed information concerning the half brother at the time he gave a statement to the American Consul in Hong Kong, when applying to be admitted for lawful residence on December 30, 1956, under the Refugee Relief Act of 1953. While we do not regard the photographs submitted as having any material probative value, upon the basis of the sworn affidavits we believe that petitioner has made a *prima facie* case that the beneficiary is a half brother by a concubine of her father who under Chinese law is regarded as a legitimate child. We shall, therefore, approve the visa petition with the admonition that the consul, in view of the absence of documents, may require additional evidence before he is satisfied as to relationship and identity.

**ORDER:** It is ordered that the visa petition be approved for fourth preference status on behalf of the beneficiary.

### BEFORE THE BOARD
(April 10, 1961)

**DISCUSSION:** The case comes forward on motion of the Assistant Commissioner, Examinations, Immigration and Naturalization Service, requesting reconsideration, in concurrence with the Depart-

400

ment of State, of the decision of this Board dated October 31, 1958, directing that the visa petition be approved for fourth preference status on behalf of the beneficiary.

The facts of the case are fully set forth in our order of October 31, 1958. Briefly, the petitioner, a native of China, a naturalized United States citizen, is the daughter of W—Y— and his wife, S—Y—Y—. The beneficiary, a native and citizen of China, is the offspring of the same father and his concubine, K—K—S—. All the parties are Chinese persons. The petitioner seeks fourth preference on behalf of the beneficiary as her brother of the half blood. In our order, we applied the law of China which regards as legitimate the offspring of a man and his concubine who was a part of his household, and granted the petition for fourth preference status.

The motion sets forth that the Department of State has asked that the decision be reconsidered on the grounds that it offends public policy and is contrary to long-standing rulings of the Department, particularly respecting citizenship rights. The position of the Service is not stated, but it is assumed that it concurs with the view of the Department of State since the motion requests withdrawal of our prior order and dismissal of the appeal.

The motion cites a number of federal and state court decisions. The federal cases involve acquisition of United States citizenship under United States Revised Statutes, section 1993.[1] The first and principal case cited in the motion is *Matter of Look Wong*, District of Hawaii Reports, p. 56 (D.C., Hawaii, August 30, 1915). The court considered the case on the assumption that the applicant, a male Chinese person, was born in China on August 3, 1898, of Chinese parents, his parents having married in 1891. At the time of that marriage the father, a resident merchant of Hawaii, had living a Hawaiian wife to whom he had been married for 20 years or more and from whom he was not divorced until February 21, 1898. In 1898 the father returned to Hawaii after a year's absence in China and in 1903 again went to China where he lived with the applicant's mother until 1913, thereafter returning to Hawaii. The applicant was, therefore, the offspring of a second or polygamous marriage. Although conceding the marriage may have been lawful in China, the court refused to accord any recognition to the polygamous marriage; since it would not recognize the polygamous relationship of the parents, it would not recognize as legitimate the

---

[1] Section 1993, Revised Statutes (Acts of April 14, 1802 and February 10, 1855) provides, in pertinent part, that all children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof are declared to be citizens of the United States. The statute was amended by the Act of May 24, 1934 to include the children of a citizen father or mother.

offspring of that relationship. The court concluded that an exception to the rule of recognition of a foreign marriage arises when the marriage contravenes the spirit and policy of our laws and institutions; that this polygamous marriage in China was within such exception and the immigrant whose status was derived from such a marriage was also within the exception to the general rule. The exclusion affirmed the immigrant inspector's decision that the applicant should be denied a landing as a Chinese person who has failed to prove a status which entitled him to admission to the United States. As will be shown later, this 1915 decision is not in accord with later concepts, nor is it governing in view of the provisions of the 1952 Immigration and Nationality Act.

The motion also cites a number of other federal cases dealing with claims of United States citizenship under Revised Statutes, section 1993. In the case of *Ng Suey Hi* v. *Weedin*, 21 F.2d 801 (C.A. 9, 1927), the appellant, the offspring of her Chinese father's second or polygamous marriage, claimed citizenship through her father. The father had married two Chinese women three years apart and cohabited with both women in the same household. The court held that the polygamous marriage was an exception to the general rule that a marriage valid by law wherein it was contracted would be held valid everywhere; that the applicant was, therefore, illegitimate and could not acquire United States citizenship under Revised Statutes, section 1993, through the father. The court referred with apparent approval to 32 *Opinions Attorney General* 162, wherein the Attorney General agreed with a Department of State holding that a child born out of wedlock which, by the law of its father's domicile, has been legitimated is a citizen within the meaning of Revised Statutes, section 1993, but held that there was no competent evidence tending to show that the appellant was rendered legitimate and for that reason the order of the court denying the writ of habeas corpus was affirmed. A necessary conclusion from the court's decision is that had there been such evidence of legitimacy or legitimation, the court may well have found the appellant to be a citizen.

Similarly, in the case of *Mason ex rel. Chin Suey* v. *Tillinghast*, 26 F.2d 588 (C.A. 1, 1928), the appellant, born in 1917 in China, claimed citizenship through a native-born United States citizen as the issue of his secondary wife whom his father had married in China during the existence of the first marriage. The holding of the court in that case was that the finding by the Board of Review that the discrepancies in the testimony were "of sufficient importance to warrant a holding that the applicant's relationship to his alleged father is not satisfactorily established" was supported by the record. Since the court decision was based upon the failure to

establish identity and relationship to the alleged father, the remainder of the decision is dictum, such dictum being to the effect that the children of secondary wives were illegitimate and there was no provision in Revised Statutes, section 1993, in regard to the citizenship of illegitimate children who might thereafter be legitimated, thus refusing to go as far as the 9th Circuit in the case of *Ng Suey Hi* v. *Weedin, supra.* This decision represents no controlling authority and the effect of the dictum is today overruled by the provisions of section 101(b)(1)(C) and section 101(c)(1) of the Immigration and Nationality Act relating to legitimation subsequent to birth.

The motion also refers to the case of *Louie Wah You* v. *Nagle*, 27 F.2d 573 (C.A. 9, 1928), in which the applicant applied for admission as a United States citizen through his native-born United States citizen father. The father had married a Chinese woman in San Francisco in 1903 and then married a second time while the first marriage was still in existence during a visit to China in 1904. He visited China in 1913 and 1924 and returned to the United States in 1926. The court held that the applicant at birth was the illegitimate offspring of a United States citizen of the Chinese race who was born in California and was domiciled in that State but the court found no competent evidence of legitimation under section 230 of the Civil Code of California and found the applicant to be not a citizen of the United States. In this case it is apparent that the court was applying the law of California regarding legitimacy.

The case of *Ex parte Ng Suey Hi*, 20 F.2d 266 (W.D. Wash., N.D., 1927), involved a Chinese applicant, the daughter of parents who lived in concubinage, who contended that under Revised Statutes, section 1993, the marital relationship between the alleged father and mother was immaterial if the blood relationship between her and the alleged father was established. The court did not rule on this contention but held that the evidence indicated that the applicant was married in China and that she had the burden of establishing that she married a United States citizen since by marriage she took the citizenship of her husband and affirmed the exclusion. Thus, this case is no precedent for the issue before us.

The motion sets forth a number of state decisions dealing with a provision of local law which makes legitimate the issue of all marriages null and void or dissolved by divorce.[2] These cases, in general, held that the statute involved applied where the parties

---

[2] *Byington* v. *Wilhelm*, 120 Okla. 190, 250 P. 1025, 1026; *Lewis* v. *Ames*, 44 Texas 319; *Defferari* v. *Terry*, 99 S.W.2d 290 (Texas, 1936); *Vanderpool et al.* v. *Ryan et al.* 137 Va. 427, 119 S.E. 65; *Hutchins* v. *Kimmell*, 31 Mich. 126.

in good faith attempted to contract the marriage relationship against which some legal barrier existed and not to a relationship immorally entered into; or that it was essential that there be a marriage of some kind before the statute could have application, but that it does not legitimize issue which is the result of illicit intercourse or illicit relationship. It is to be noted that in each case by virtue of the law of the forum the relationship was either immoral or illicit in contrast to the relationship present in the instant case which was a recognized relationship under the law of the forum. In at least one of these states, to wit, the State of Michigan, in respect to a polygamous Indian marriage contracted in conformity with tribal law, not only have the children of the first wife been recognized as legitimate but those born of the second union as well.[3]

By the great weight of authority, the legitimacy of a child, not only for the purpose of determining whether he can inherit, but for all other purposes, is to be determined by the law of the place where he was born and parents were domiciled; a child, therefore, that is legitimate in the place of his birth is legitimate everywhere.[4] The general rule is that the status of legitimacy is created by the law of the domicile of the parent whose relationship to the child is in question; the legitimate kinship of a child to either parent from the time of the child's birth is determined by the law of the state of domicile of that parent at that time; the status of legitimacy, created by the law of a state having jurisdiction so to do, will be given the same effect in another state as is given by the latter state to the status created by its own law.[5]

The effect of the federal court decisions referred to in the motion involving claims of citizenship under section 1993, Revised Statutes, is rendered inapplicable because of the presence of a new immigration law declaring a much more liberal public policy with regard to illegitimacy and to legitimation. Thus, section 101(b)(1) [8 U.S.C. 1101(b)(1)] defines the term "child" as not only including "(A) a legitimate child," but by the amendment of section 2 of the Act of September 11, 1957 added a subparagraph (D) which included an illegitimate child by virtue of the relationship of the child to its natural mother. Similarly, section 101(b)(1)(B), as amended, redefines the term stepchild to include a stepchild whether or not born out of wedlock. Thus, the immigration law has broken

---

[3] See Lorenzen, *Selected Articles on the Conflict of Laws* (1947), p. 400, citing *Kobogum* v. *Jackson Iron Company*, 76 Mich. 498, 43 N.W. 602.

[4] Madden, *On Persons and Domestic Relations* (1931), p. 347.

[5] *Restatement of the Law of Conflict of Laws* (1934). sections 137, 138 and 141; Beale, *The Conflict of Laws* (1935 ed.), pp. 704–705; Goodrich, *Conflict of Laws* (1949 ed.), p. 435.

completely away from the old common-law conception of the illegitimate child as a *nullius filius* or *nullius populi*.[6]

The dictum in the case *Mason ex rel. Chin Suey* v. *Tillinghast*, 26 F.2d 588, to the effect that children of secondary wives were illegitimate and there was no provision in Revised Statutes, section 1993, in regard to the citizenship of illegitimate children who might thereafter be legitimated is no longer applicable since the provisions of section 101(b)(1)(C) of the Immigration and Nationality Act [8 U.S.C. 1101(b)(1)(C)] define the term "child" to include a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States. This section of the immigration law goes even beyond the general rule set forth by writers on conflict of laws.[7] Thus, the present immigration law reflects a more liberal legislative public policy with respect to illegitimate and to legitimated children and seeks to apply the law most favorable to the legitimation of the child who was born illegitimate.

The conclusion reached by the Board as to the legitimacy of the present beneficiary who was legitimate under the law of the place of its birth and of the domicile of its parents is strongly supported by the Attorney General's holding in *Matter of B—S—*, 6—305. That case involved a visa petition filed by a citizen mother on behalf of her child born out of wedlock in China who, by the law of China, was legitimate in relation to its mother. (It is to be noted that this case arose before the addition of subparagraph (D) to section 101(b)(1) of the Immigration and Nationality Act by section 2 of the Act of September 11, 1957, which recognizes an illegitimate child in relation to its mother.) After citing the accepted view that where the identity of the parents is established considerations of public policy no longer forbid the recognition of their relationship to the child, it was observed that legitimation in the several states of the Union may be accomplished in various ways, such as a judicial proceeding; recognition and acknowledgment by the putative father; by recognition alone; by statutes of adoption requiring admission into the family; by recognition alone or acknowledgment in writing, as well as

[6] The decisions of the Attorney General in *Matter of M—*, 5—120, declaring that a child born out of wedlock prior to the marriage of a woman to a United States citizen who was not the father of the child is not a stepchild within the meaning of section 101(b)(1)(B) of the Immigration and Nationality Act, and in *Matter of A—*, 5—272, holding that an illegitimate child derives no immigration benefit or status through its citizen mother resulted in legislation overruling these holdings in sections 1 and 2 of the Act of 1957 (71 Stat. 639), amending section 101(b)(1) of the Immigration and Nationality Act, exemplifying the deep concern of Congress with a more liberal treatment of illegitimate children.

[7] See footnotes (4) and (5).

the more usual method of legitimation by subsequent marriage of the parents. It was concluded that the law looks with favor upon the status of legitimacy and will confer recognition upon such status created in accordance with the law of a child's origin, as well as under the law of the father's residence or domicile. The Attorney General approved the finding that a child born out of wedlock in China who, by the law of the place of his birth, was legitimate in relationship to his mother, should also be recognized for immigration purposes under well-accepted principles of law extending comity to the status of legitimacy under the laws of a foreign state or country.

Actually, the principle of comity in recognizing status is no longer involved. In the present Immigration and Nationality Act we are confronted with a specific provision in section 101(b)(1)(C) that a child, who is legitimated in accordance with the law of the child's residence or domicile, or the law of the father's residence or domicile, *whether in or outside the United States*, shall be recognized as a "child" for immigration or nationality purposes under Titles I, II and III of the Immigration and Nationality Act. Thus, in recognizing the child of the concubine who is legitimated under the law of China, the place of domicile and residence of the parent and of the offspring, we are doing no more than applying the positive, specific provisions of the Immigration and Nationality Act.

It is to be remembered that our holding merely gives recognition to the status of legitimacy of a child, properly created under applicable law in accordance with the positive provisions regarding legitimacy and legitimation pursuant to section 101(b)(1) of the Immigration and Nationality Act as enacted and as amended by the Act of September 11, 1957. Similar language is contained in section 101(c)(1) as used in Title III. The Service motion makes a passing reference to these provisions but fails to give them their true significance. Instead, the motion launches a collateral attack upon polygamy and concubinage which are not involved in the holding. Our holding makes no change in the law regarding polygamy and concubinage. All we are doing by our decision is applying the positive provisions of the Immigration and Nationality Act regarding legitimation by giving recognition to a status validly created under the foreign law of the residence or domicile of the child or parent. The reference in the motion to polygamy and concubinage merely obscures and hides the sole holding in this case.

The motion notes somewhat apprehensively that a large number of children of concubines will become eligible for status if the off-spring of concubines are recognized. It is believed that this fear is as ill-founded as worrying about the large size of the usual foreign-born family. It is not the size of the family that we are

concerned about; our only concern is that a *bona fide* family unit, recognized as such under the immigration laws, shall not be separated by strained and artificial reasoning. The burden of establishing relationship and identity is on the petitioner. In passing, the Library of Congress, Far Eastern Law Section, has informed us that the Chinese Civil Code of 1930 does not recognize the system of concubinage.[8] The legitimation of children born out of wedlock since 1930 would be governed by the provisions of Articles 1064 and 1065 of the Chinese Civil Code of 1930 relating to legitimation by subsequent marriage of the natural parents or by acknowledgment by the natural father. The burden of proof rests on the petitioner to establish the claimed relationship and identity of the beneficiary. The possibilities of fraud are no greater than is involved in cases involving adopted children.[9]

We see no reason to reconsider our holding that the child of the concubine who, under the Chinese law, is legitimate by virtue of the acknowledgment by the natural father is recognized as a legitimated child. The visa petition filed by the citizen petitioner for fourth preference quota status for the beneficiary, her half brother, is approved.

In view of the interest and concern expressed by the Department of State, we shall on our own motion certify our decision to the Attorney General.

ORDER: It is ordered that the motion be denied and that our order of October 31, 1958, approving the visa petition for fourth preference status be affirmed.

*It is further ordered* that the case be referred to the Attorney General for review in accordance with 8 CFR 3.1(h)(1)(ii).

### BEFORE THE ATTORNEY GENERAL
(August 7, 1961)

DISCUSSION: The issue in this case is whether the beneficiary is entitled to fourth preference status under section 203(a)(4) of the Immigration and Nationality Act of 1952 [66 Stat. 178; 8 U.S.C. 1153(a)(4)] as the "brother" of an American citizen. The petitioner and the beneficiary, both natives of China, are children of the same father; the petitioner, born in 1914, is the daughter of the father's wife and the beneficiary, born in 1929, is the son of one of the father's five concubines.

The Act does not define "brother." The normal definition is a person having the same parents or parent as another. Funk and Wagnall's *New Standard Dictionary of the English Language* (1947 ed.); Bouvier's *Law Dictionary* (3rd rev., 1914); Black's *Law*

---

[8] Judicial Yuan Interpretation No. 735 (1932); Shang No. 1727 (1932).

[9] *Matter of Y—K—W—*, 9—176 (Atty. Gen., Feb. 28, 1961).

*Dictionary* (4th ed., 1951). It is settled that legitimate half brothers and half sisters are entitled to preference status under section 203(a)(4). *Matter of DeF—*, 6—325 (1954); *Matter of D—M—*, 7—441 (1957); Gordon and Rosenfield, *Immigration Law and Procedure*, § 2.28b; H. Rept. No. 1199, 85th Cong., 1st Sess., p. 8. Thus the question to be determined is whether, for purposes of Title II of the Immigration and Nationality Act of 1952, the petitioner and the beneficiary should be recognized as children of the same father.

Section 101(b)(1)(C) of the 1952 Act [8 U.S.C. 1101(b)(1)(C)] defines "child," as used in section 203 and other provisions of the Act, as including:

a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in or outside the United States, if such legitimation takes place before the child reaches the age of eighteen years and the child is in the legal custody of the legitimating parent or parents at the time of such legitimation.

That definition is applicable to determine status under section 203 and other provisions of Title II of the Act. H. Rept. No. 1365, 82d Cong., 2d Sess., p. 33.

After careful examination of applicable Chinese law, based on a memorandum furnished by the Library of Congress, the Board of Immigration Appeals concluded, on October 31, 1958, that the children of a concubine who lives in the same household as the father, were regarded, under the Chinese Civil Code of 1930 and under previously existing Chinese law, as acknowledged by the father and therefore legitimate. It also held that the petitioner had made a *prima facie* showing that the beneficiary was a child of the petitioner's father and that the beneficiary and his mother lived with the father as part of the same household. I interpret this finding as a finding also that the beneficiary was in the legal custody of his father at his birth and for some time thereafter.

These findings as to Chinese law and as to the facts relating to the relationship between the petitioner, the beneficiary and their parents, are not contested. The Immigration and Naturalization Service, by petition for reconsideration filed January 16, 1961, with the concurrence of the State Department, argued that the decision of the Board is offensive to public policy and is contrary to court precedents involving claims to United States citizenship. On April 10, 1961, the Board affirmed its prior order and ordered that the case be referred to me for review.

In my opinion, the Board correctly applied the applicable provisions of the 1952 Act. Congress has determined the public policy of the United States, for purposes of the preference provisions

under the quota system, by providing in section 101(b)(1)(C) that a child who has been legitimated under the laws of his own or his father's residence, and who lived in the custody of the legitimating parent, shall be deemed a legitimate child. This provision, and section 203, were intended to implement "the well-established policy of maintaining the family unit wherever possible." H. Rept. No. 1365, 82d Cong., 2d Sess., p. 39; see also p. 29. The importance which Congress attached to this objective was reemphasized in 1957 in connection with legislation which further extended the definition of "child" in section 101(b)(1)(C) to include an illegitimate child by reason of its relationship to its natural mother. The House Committee Report on that legislation reiterates the purpose underlying section 101(b)(1)(C) in the 1952 Act, in the following terms:

In the report accompanying H.R. 5678, 82d Congress, which became the Immigration and Nationality Act (H. Rept. No. 1365, 82d Cong., p. 29), it was stated that the bill implements the underlying intentions of our immigration laws regarding the preservation of the family unit. Section 202(a) of the act authorizes various quota charges outside the usual rules for the obvious purpose of avoiding separation of family members so far as possible. In a number of other instances, the statutory language makes it clear that *the underlying intent of the legislation was to preserve the family unit upon immigration to the United States.*

*Sympathetic and humane considerations dictate an interpretation which would not separate the child, whether legitimate or illegitimate, from its alien parent,* particularly in those cases where the citizen parent has executed a petition for the issuance of a nonquota visa to such child and has evidenced an intent to regard the illegitimate stepchild of his spouse as a part of his own family and to raise that child as a part of the family unit. There is ample judicial authority to support a construction which would include the illegitimate child of the spouse as the stepchild of the person who has married the parent of that child. The case of an immigrant who, upon reaching majority, desires to bring to the United States under the preferential provisions of the law, his mother, to whom he was born out of wedlock, is not different from the case of the stepchild above mentioned. *Also, there seems to be no difference in the case of a half brother or half sister,* born out of wedlock, *who desires to confer preferential immigrant status under section 203(a)(4) of the Immigration and Nationality Act.* And again there is no difference in the case of a child eligible to benefit from the provisions of section 202(a)(1) of the said Act except for the fact that it was born out of wedlock. *In view of the clearly expressed legislative intention to keep together the family unit wherever possible, it would appear to be a desirable result, based upon legal and equitable considerations, to adopt a liberal construction. No harm could possibly result from such a construction, and the consequences would fulfill the humane considerations involved in keeping intact the family unit.* H. Rept. 1199, 85th Cong., 1st Sess., p. 8 (emphasis added).

I cannot attribute to a Congress thus solicitous for keeping together those persons who have in fact lived together as a family an intention to deny fourth preference status to children who were

regarded as legitimate brothers and sisters under the law of their own and their parent's residence.

The Immigration Service cites various judicial decisions for the proposition that it is contrary to public policy to recognize the relationship of concubinage and the legitimacy of the offspring of that relationship. The Service also cites decisions denying citizenship under section 1993, Revised Statutes, to offspring of a polygamous marriage. These decisions are discussed in detail in the Board's decision of April 10, 1961. None of the cases cited involve the interpretation of the Immigration and Nationality Act of 1952, nor of comparable statutory provisions determining the legitimacy of a child by the law of the place of residence of the child or its parents. Since Congress has declared the public policy of the United States, judicial notions of public policy, announced in the absence of any controlling legislative declaration, are inapplicable.

It is appropriate to point out, however, that neither this decision nor the 1952 Act implies any approval of the institution of concubinage. On the contrary, Congress has excluded from entry "aliens who are polygamists." Section 212(a)(11) and this decision do not sanction the entry into the United States of anyone who has engaged in, or advocates, the practice of concubinage. But Congress deems it more in accordance with humanitarian principles to try to keep together those offspring of a common parent who have lived together as a family unit in accordance with the established laws and institutions of their place of residence, regardless of whether or not those laws are in conformity with our own social and family institutions. This decision gives effect to that policy.

**ORDER:** The decision and order of the Board of Immigration Appeals of April 10, 1961, is affirmed.